FILED

MAY 28 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

OA 91   Criminal Complaint

# United States District Court

| NORTHERN | DISTRICT OF | CALIFORNIA |

UNITED STATES OF AMERICA
V.

MAURICIO SICILIANO

**CRIMINAL COMPLAINT**

JSC

3  14  7074 €

Case Number: _____

MAURICIO SICILIANO

*(Name and Address of Defendant)*

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about ___see attached___ in ___see attached___ County, in the ___Northern___ District of ___California___ defendant(s) did,

(Track Statutory Language of Offense)
See attached

in violation of Title ___18___ United States Code, Section(s) ___see attached___ .

Count 1: 1349, 1343 and 1346 - conspiracy to commit honest services wire fraud; Count 2: 1343, 1346, and 2 - honest services wire fraud; Count 3: 371, 666(a)(1)(B) & (a)(2) - conspiracy to receive and give bribes relating to federal program; Count 4: 666(a)(1)(B) and 2 - receiving bribes relating to federal program; Count 5: 666(a)(2 and 2 - giving bribes relating to federal program

I further state that I am a(n) ___Special Agent, Federal Bureau of Investigation___ and that this complaint is based on the following facts:

See Attached Affidavit of Special Agent K.S. Bagchi

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Approved
As To
Form:  Acadia Senese/Arianna Berg/Joe Wheatley/W.S. Wilson Leung
AUSA

K.S. Bagchi
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

May 28 2014
Date

at  San Francisco    California
City and State

HON. JACQUELINE SCOTT CORLEY    U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer

Signature of Judicial Officer

## COUNT ONE

### (Conspiracy to Commit Honest Services Wire Fraud)

1.      From at least in or about 2005, up through and including in or about June 2010, in the Northern District of California and elsewhere, the defendant,

#### MAURICIO SICILIANO,

and others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to commit honest services wire fraud,  in violation of Title 18, United States Code, Sections 1343 and 1346.

2.      It was a part and an object of the conspiracy that the defendant,

#### MAURICIO SICILIANO,

and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and to deprive SICILIANO's employer, the International Civil Aviation Organization ("ICAO") of its intangible right to SICILIANO's honest services, and to obtain money and property by means of false and fraudulent pretenses, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, including interstate and foreign e-mail communications and interstate and foreign wire transfers, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346, to wit, SICILIANO and his co-conspirators agreed that SICILIANO would receive bribes in the form of money and other things of value in exchange for SICILIANO using his official position within ICAO to benefit the bribe payers.

### Overt Act

3.      In furtherance of the conspiracy and to effect the illegal object thereof, the defendant, MAURICIO SICILIANO, and his co-conspirators committed the following overt act, among others, in the Northern District of California:

a.      On or about September 23, 2009, a co-conspirator not named as a defendant

herein and referenced as "CC-2" in the attached complaint sent an e-mail message to

SICILIANO, which traveled through the Northern District of California.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO

(Honest Services Wire Fraud)

4.      From at least in or about 2005, up through and including in or about June 2010, in the

Northern District of California and elsewhere, the defendant,

MAURICIO SICILIANO,

and others known and unknown, unlawfully, willfully, and knowingly, having devised and

intending to devise a scheme and artifice to defraud, and to deprive SICILIANO's employer,

ICAO, of its intangible right to SICILIANO's honest services, and to obtain money and property

by means of false and fraudulent pretenses, transmitted and caused to be transmitted by means of

wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and

sounds, including interstate and foreign e-mail communications and interstate and foreign wire

transfers, for the purpose of executing such scheme and artifice, to wit, SICILIANO received

bribes in the form of money and other things of value in exchange for SICILIANO using his

official position within ICAO to benefit the bribe payers.

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

COUNT THREE

(Conspiracy to Receive and Give Bribes Involving a Federal Program)

5.      From at least in or about 2005, up through and including in or about June 2010, in the

Northern District of California and elsewhere, the defendant,

MAURICIO SICILIANO,

and others known and unknown, unlawfully, willfully, and knowingly combined, conspired,

confederated, and agreed together and with each other to solicit bribes involving a federal

program, in violation of Title 18, United States Code, Section 666(a)(1)(B), and give bribes

involving a federal program, in violation of Title 18, United States Code, Section 666(a)(2).

6.      It was a part and an object of the conspiracy that the defendant,

MAURICIO SICILIANO,

being an agent of an organization, to wit, ICAO, unlawfully, willfully, and knowingly would and

did corruptly solicit and demand for the benefit of a person and accept and agree to accept

something of value from a person, intending to be influenced and rewarded in connection with

such a business, transaction, and series of transactions of ICAO, involving something of value of

$5,000 and more, while ICAO was in receipt of, in any one year period, benefits in excess of

$10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance,

and other form of Federal assistance, in violation of Title 18, United States Code, Section

666(a)(1)(B), to wit, SICILIANO agreed to accept bribes in the form of money and other things

of value in exchange for using his official position within ICAO to benefit the bribe payers.

7.      It was further a part and an object of the conspiracy that the defendant,

MAURICIO SICILIANO,

unlawfully, willfully, and knowingly would and did corruptly give, offer, and agree to give

something of value to a person, with intent to influence and reward an agent of ICAO, in

connection with a business, transaction, and series of transactions of ICAO, involving something

of value of $5,000 and more, while ICAO was in receipt of, in any one year period, benefits in

excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee,

insurance, and other form of Federal assistance, in violation of Title 18, United States Code,

Section 666(a)(2), to wit, SICILIANO agreed to accept bribes in the form of money and other

things of value in exchange for using his official position within ICAO to benefit the bribe

payers.

<u>Overt Act</u>

8.     In furtherance of the conspiracy and to effect the illegal objects thereof, the defendant, MAURICIO SICILIANO, and his co-conspirators committed the following overt act, among others, in the Northern District of California:

       a.     On or about September 23, 2009, CC-2 sent an e-mail message to SICILIANO, which traveled through the Northern District of California.

       All in violation of Title 18, United States Code, Section 371.

<u>COUNT FOUR</u>

(Receipt of Bribes Involving a Federal Program)

9.     From at least in or about 2005, up through and including in or about June 2010, in the Northern District of California and elsewhere, the defendant,

MAURICIO SICILIANO,

being an agent of an organization, to wit, ICAO, unlawfully, willfully, and knowingly corruptly solicited and demanded for the benefit of a person and accepted and agreed to accept something of value from a person, intending to be influenced and rewarded in connection with such a business, transaction, and series of transactions of ICAO, involving something of value of $5,000 and more, while ICAO was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, SICILIANO accepted bribes in the form of money and other things of value in exchange for using his official position within ICAO to benefit the bribe payers.

       All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

<u>COUNT FIVE</u>

(Giving Bribes Involving a Federal Program)

10.    From at least in or about 2005, up through and including in or about June 2010, in the Northern District of California and elsewhere, the defendant,

MAURICIO SICILIANO,

4

unlawfully, willfully, and knowingly corruptly gave, offered, and agreed to give something of value to a person, with intent to influence and reward an agent of ICAO, in connection with a business, transaction, and series of transactions of ICAO, involving something of value of $5,000 and more, while ICAO was in receipt of, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, to wit, SICILIANO aided and abetted the giving of bribes to him in the form of money and other things of value in exchange for using his official position within ICAO to benefit the bribe payers.

All in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, K.S. BAGCHI, being duly sworn, hereby state:

### INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since June of 2000. During my tenure as a Special Agent, I have been tasked with narcotics, terrorism, and organized crime investigations. Based on these investigations, I have gained experience with the use of a variety of law enforcement techniques including the following: witnesses, including informants and cooperating witnesses; analysis of financial, business, and e-mail records; analysis of Bank Secrecy Act records; domestic and foreign witness interviews; letters rogatory; mutual legal assistance treaties; *ex parte* applications for tax information; utilization of electronic and wire interceptions; the utilization of cooperating witnesses and consensual recordings; the use of physical surveillance techniques including the use of pole cameras and recorders; the use of geographic analysis information regarding mobile telephone systems; the analysis of historical telephone records and the utilization of dialed number recorders and trap/trace devices; and various other types of electronic surveillance techniques such as body wires and transmitters.

2. This Affidavit is being submitted in support of a criminal complaint charging MAURICIO SICILIANO with: (1) conspiring to commit wire fraud to deprive the International Civil Aviation Organization ("ICAO") of its right to honest services, in violation of 18 U.S.C. §§ 1343, 1349, and 1346; (2) wire fraud depriving ICAO of its right to honest services, in violation of 18 U.S.C. §§ 1343, 1346, and 2; (3) conspiring to receive and give bribes in connection with a program receiving at $10,000 per annum from the federal government, in violation of 18 U.S.C. §§ 371 and 666(a)(1)(B); (4) receiving bribes in connection with a program receiving at $10,000 per annum from the federal government, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2; and (5) giving bribes in connection with a program receiving at $10,000 per annum from the federal government, in violation of 18 U.S.C. §§ 666(a)(2) and 2.

3. I am familiar with the facts as set forth herein based on my conversations with others, including other law enforcement officers and governmental officials, as well as from my personal review of information contained in the reports of other law enforcement officers, documents (in both hard copy and electronic form) provided by various entities and available publicly, and electronic mail ("e-mail") seized pursuant to search warrant. Where I report information learned from other sources, such information is reported in sum and substance and in relevant part. In addition, this Affidavit contains information necessary to support probable cause and is not intended to include each and every fact and matter observed by or known to me or other law enforcement officers involved in this matter.

### FACTUAL BASIS FOR PROBABLE CAUSE

4. I learned the following from my investigation, which includes reviewing publicly-available information relating to ICAO, publicly-available information relating to a Ukrainian company called EDAPS Consortium, and speaking with other law enforcement officers and witnesses:

      a. ICAO is a specialized agency of the United Nations that is responsible for, among other things, standardizing machine-readable passports, including biometric passports. The standards that ICAO establishes and disseminates are used in determining which features should be used in passports by a variety of countries, including the United States. Because of ICAO's

role in establishing international standards for machine-readable and biometric passports, having even the implied approval of ICAO is beneficial to businesses engaged in the design and manufacturing of machine-readable and biometric passports.

      b. In or about 2005, ICAO's annual budget was $64,669,000, and has increased each year. In 2013, ICAO's annual budget was $95,264,000. During this time period, the United States' contributions constituted approximately 25% of ICAO's annual budget, i.e., between roughly 2005 and 2013, the United States provided between roughly $16.2 million to $23.8 million each year to ICAO.

      c. Since at least 2005, MAURICIO SICILIANO has been an executive of ICAO's Machine Readable Travel Documents Programme, which is responsible for standardization of machine-readable passports.

      d. According to its website, EDAPS Consortium ("EDAPS") is "a world leader in the protected printing industry and the originator of this branch of industry in Ukraine. Since 2004 the Consortium has accomplished large state and corporate projects on the development and implementation of identification documents, registers, databases, automated systems of data recording and management." The website also states that EDAPS utilizes state-of-the art holographic and biometric technologies to manufacture an array of identification and security productions, including passports, driver's licenses, airline crew badges, bank cards, tax stamps, voting ballots, and negotiable instruments. According to the website of Znak, which is a member of the EDAPS Consortium, a co-conspirator not named as a defendant herein ("CC-1") is the Chairman of the EDAPS Consortium Advisory Council. A second co-conspirator not named as a defendant herein ("CC-2") is CC-1's nephew and serves as EDAPS's Chairman of the Board. Other public sources, including EDAPS's own promotional material and the website for the International Criminal Police Organization ("INTERPOL"), indicate that EDAPS is attempting to establish itself globally, including in the United States market, as a manufacturer of security and identity productions, and that EDAPS attempted to produce an electronic passport ("e-passport") for INTERPOL.

5. In or about 2011 and the first half of 2012, I interviewed an individual (the "Witness") who implicated him/herself[1], as well as CC-1 and CC-2, in a scheme to pay bribes and provide other benefits to SICILIANO in exchange for SICILIANO using his official position in ICAO to help EDAPS's business. According to the Witness:

      a. The Witness has known and worked with and for CC-1 since at least the late 1990s. One of the major early successes for EDAPS was winning in 2004 the contract to produce Ukrainian passports.

      b. The Witness claimed that in or about 2005, ICAO indicated it was interested in the manufacture of Ukrainian passports, and EDAPS began dealing with ICAO. Association with and an endorsement from ICAO were worth a lot to EDAPS, and SICILIANO --- by virtue of his position in ICAO's Machine Readable Travel Documents Programme --- was well positioned to introduce EDAPS to government officials and private entities who could be potential clients and business contacts for EDAPS. Moreover, SICILIANO could also arrange for EDAPS to appear at ICAO conferences as a sponsor, which would bolster EDAPS's publicity efforts.

---

[1] In or about the Spring of 2011, the Witness pled guilty to wire and mail fraud-related offenses and subsequently was sentenced to 12 months' imprisonment. Following his guilty plea, the Witness agreed to meet with me and to testify in the Grand Jury pursuant to a use-immunity agreement. The Witness has since served his term of imprisonment and has no pending criminal cases with the United States.

c. In or about the summer of 2005, SICILIANO asked the Witness for $3,000 in cash each month in exchange for introducing and publicizing EDAPS to the right government officials. The Witness advised CC-1 of SICILIANO's offer and provided CC-1 with SICILIANO's personal banking information. CC-1 stated to the Witness that he preferred to make the payments to SICILIANO not in cash but via wire transfers so that he (CC-1) could conceal the payments by fabricating business documentation, such as contracts and/or invoices. Approximately three or four months later, SICILIANO contacted the Witness and complained the payments had stopped. The Witness inferred that CC-1 made three to four payments to SICILIANO but then stopped because SICILIANO failed to arrange the meetings for EDAPS that he promised he would.

d. Several years later, in or about 2007, CC-2 advised the Witness that he (CC-2) would be handling the relationship with SICILIANO. CC-2 promised to pay SICILIANO $5,000 per month. The Witness was unsure if CC-2 actually made any payments to SICILIANO in 2007. However, in one of EDAPS' press releases that year, EDAPS identified SICILIANO as a representative of ICAO who had praised a Ukrainian business partnership in which EDAPS was a part for its production of passports. In addition, the Witness reported that CC-2 arranged for SICILIANO to travel to Dubai --- where CC-2 and CC-1 lived --- to pay SICILIANO. The Witness also reported that CC-2 also arranged for SICILIANO's son (the "Son") to travel to Dubai in order to give the Son a job. The Witness also reported that SICILIANO introduced him/her to Kenyan governmental officials who later accepted bribes in exchange for favorable treatment for EDAPS.

e. In or about 2009, CC-1 directed the Witness to re-establish the relationship with SICILIANO. CC-1 explained that his nephew CC-2 had damaged the relationship between SICILIANO and EDAPS. Among other things, CC-1 wanted the Secretary General of INTERPOL to speak at an ICAO event. Thus, CC-1 gave $3,000 in cash to the Witness to offer to SICILIANO. In or about July 2009, the Witness traveled to Montreal, Canada, gave the $3,000 to SICILIANO --- who accepted the money --- and assured SICILIANO that CC-2 was no longer going to handle the relationship between SICILIANO and EDAPS. Notably, several months later, the Secretary General of INTERPOL appeared at an ICAO event as CC-1 wanted: according to a webpage for an EDAPS member company, "on September 21, [2009], at the opening ceremony of the ICAO Symposium, INTERPOL Secretary General … announced that the EDAPS Consortium had been chosen to design and produce the world's largest police organization's first-ever e-passport."

6. According to ICAO's website, in 2009, EDAPS --- represented by CC-1 --- sponsored an ICAO symposium regarding machine-readable documents that SICILIANO attended. In addition, according to information posted on ICAO's website, as recently as September 14, 2011, EDAPS sponsored a conference regarding travel documents in which SICILIANO participated as a panelist.

7. As part of my investigation, I sought and received search warrants for the "gmail" e-mail accounts of SICILIANO, CC-2, and others.[2] The e-mail messages corroborate the Witness's information regarding SICILIANO's receipt of bribes from CC-1 and CC-2. Much of the e-mail traffic involved SICILIANO discussing ways he could help CC-1 and CC-2 with their businesses. For instance:

---

[2] Google, Inc., located in Mountain View, California, is the service provider for gmail.

a. On or about October 5, 2007[3], SICILIANO sent a message to CC-2's account providing a contact at the United Nations for the *Laissez-Passer*[4] program. In response, CC-2 thanked SICILIANO for the contact and advised him that the Witness will be contacting him to draft an ICAO request for an EDAPS employee to be assigned to a Technical Advisory Group in ICAO. Later that day, CC-2 sent an email to SICILIANO requesting that SICILIANO work with the Witness to draft a letter from ICAO to the Ukrainian Ministry of Interior. CC-2 also asked if ICAO could certify Ukrainian e-passports. Approximately 20 minutes later, SICILIANO responded and provided steps on how CC-2 could get Ukrainian e-passports certified by ICAO.

b. On or about October 6, 2007, SICILIANO forwarded to CC-2 an e-mail request from a United Nation's *Laissez-Passer* official seeking recommendations. SICILIANO suggested to CC-2 that he (CC-2) get involved. In response, CC-2 wrote back to SICILIANO that he (CC-2) had a consulting company in mind for the United Nation's *Laissez-Passer* program and that he would be willing to offer encryption technology to the program for free.

c. On or about October 12, 2007, SICILIANO forwarded to CC-2 an e-mail he (SICILIANO ) previously wrote responding to an OSCE[5] request to discuss funding regarding Machine Readable Travel Documents ("MRTD") projects. In the e-mail to OSCE, SICILIANO seemed to refer the OSCE to EDAPS for assistance, thereby endorsing EDAPS: "As per the presentation on financing, I will not feel comfortable doing it....If not, you may want to contact the EDAPS group ([the Witness's name]). They were sponsors during our Symposium and were the only company that mentioned anything related to financing MRTD projects." The next day, on or about October 13, 2007, CC-2 sent an e-mail to the Witness, declaring that he (CC-2) wanted to do a presentation on MRTD funding for the OSCE. The following day, on or about October 14, 2007, the Witness sent an e-mail to the OSCE, copying SICILIANO and CC-2, stating that EDAPS would be willing to make a presentation on MRTD funding.

d. On or about October 15, 2007, CC-2 responded to a question from the Witness asking if SICILIANO and a particular Kenyan official should arrive in Dubai on the same day. CC-2 suggested that the Witness keep them one day apart. This e-mail is consistent with the Witness's information stating that SICILIANO introduced the Witness to Kenyan officials, that CC-1 paid SICILIANO in Dubai, and that the Witness had made bribe payments on behalf of CC-1 to both SICILIANO and a Kenyan official.

e. On or about January 24, 2008, CC-2 was copied on an e-mail sent by the Witness to an employee of ICAO. In the e-mail, the Witness accepted, on behalf of EDAPS, platinum level sponsorship of an upcoming ICAO event.

f. On or about January 15, 2009, CC-2 sent an e-mail to an employee in the Office of the Secretary General at INTERPOL (the "INTERPOL Employee"), enclosing a 2004 ICAO letter from SICILIANO expressing support for EDAPS, as well as a further statement of support

---

[3] The users of the various e-mail accounts cross time zones often due to business/personal travel. For standardization purposes, all dates/times associated for e-mail communications referenced herein are based on the time they were received by Google's servers in the Pacific Time Zone.

[4] Based on my investigation and experience, I know that the United Nation's *Laissez-Passer* is a travel document, akin to a passport, issued to United Nation's officials and employees to use while traveling on official business.

[5] Based on my investigation and experience, I know that the OSCE is the Organization for Security and Cooperation in Europe, an inter-governmental organization charged with coordinating security among member states.

from SICILIANO. Based on my investigation, I know that the INTERPOL Employee was, at the time, charged with conducting due diligence on companies seeking to do business with INTERPOL and that, at the time, EDAPS was seeking business with INTERPOL.

g. On or about January 18, 2009, CC-2 sent an e-mail to the INTERPOL Employee offering to arrange a call between the INERPOL Employee and SICILIANO so that SICILIANO could verbally confirm his endorsement of EDAPS. Later, CC-2 wrote another e-mail to the INTERPOL Employee offering to provide a photograph of himself (CC-2) with SICILIANO as proof of SICILIANO's endorsement of EDAPS. In response, the INTERPOL Employee wrote that s/he may possibly request SICILIANO's support in writing, and CC-2 replied that he will speak with SICILIANO shortly.

h. On or about April 24, 2009, SICILIANO used his Facebook account to send an e-mail to CC-2 advising CC-2 to use a gmail account for "business" and stating that he (SICILIANO ) would provide the account soon.

i. On or about September 23, 2009, CC-2 sent SICILIANO via e-mail a hypertext link to a webpage containing an INTERPOL resolution. The next day, on or about September 24, 2009, SICILIANO responded, thanking CC-2 for the previous e-mail and stating that the timing of the meeting of the Secretary General of ICAO and the presenting of a Memorandum of Understanding and a gift was "great." As noted above, CC-1 and CC-2 were seeking business from INTERPOL and were trying to use ICAO's imprimatur to market EDAPS to INTERPOL. Thus, this e-mail suggests that CC-2 was keeping SICILIANO informed of ties between ICAO and INTERPOL.

j. On or about October 19, 2009, SICILIANO wrote to CC-2 that he (SICILIANO ) was trying to help CC-2 with EDAPS's Ukrainian passport project: "I am reviewing the letter you left me requesting a letter 'certifying' that the Ukraine ePassport is ICAO compliant. As you know, ICAO does not certify passports or processes. However, I am trying to find a wording that would be loose, but good enough to serve your purposes. Also, I am afraid that, if I pass it through my present chief, it would not be signed. (I am having terrible relations with my present chief.)" Appended to the e-mail was a note from CC-2 stating that the INTERPOL General Assembly approved the e-passport, to which SICILIANO responded, "Alright! Good for the project!"

k. Two days later, on or about October 21, 2009, SICILIANO wrote to CC-2 that he had had to intervene on behalf of EDAPS: "Just for your information, I had to intervene today on allowing EDAPS pay for Ukraine PKD fees. There was a complication that was about to send back the request from Ukraine, making very difficult their participation. But now all is OK. Was not easy, but that's what we are here for, don't we? ...;-)" (emoticon in original).

l. On or about October 23, 2009, SICILIANO responded to CC-2's continued request for a certification letter by writing, "On the letter, I will try to draft it in a way that I can sign it and send it, without going through my chief."

m. On or about October 29, 2009, SICILIANO advised CC-2 that he (SICILIANO) had notified an EDAPS employee of some limitations and constraints on letters from ICAO. Appended to the e-mail was the referenced e-mail to the EDAPS employee, in which SICILIANO explained: "I had a look at it and it does not fully comply with ICAO format and content. Also, it is not customary in ICAO to make reference to companies providing products and services. Thus, we are trying to come up with a proper letter" I believe that, consistent with the conclusion that SICILIANO was favoring EDAPS, SICILIANO was working together with an EDAPS employee to draft a certification letter sought by EDAPS that SICILIANO could sign.

n.  On or about November 5, 2009, SICILIANO sent a draft letter to CC-2 for CC-2's review.  SICILIANO suggested that CC-2 accept the fact that the letter would be signed by someone other than the Secretary General of ICAO.  The next day, on or about November 6, 2009, CC-2 responded to SICILIANO, stating that he liked the letter but still asking for the Secretary General's signature.

o.  On or about November 11, 2009, SICILIANO sent an e-mail to CC-2 advising CC-2 that Canada decided not to accept the INTERPOL passport.  SICILIANO suggested to CC-2 that the Secretary General of INTERPOL pass a protocol within INTERPOL requiring member states to adopt the INTERPOL passport in order to avoid this problem.  As noted above, in 2009, INTERPOL gave EDAPS the task of developing a passport for INTERPOL.  Thus, I believe that the unwillingness of countries such as Canada to accept the INTERPOL passport developed by EDAPS would have adversely affected EDAPS's business, which would explain SICILIANO's advice to CC-2.  Later, that day, SICILIANO's e-mail to CC-2 was forwarded to another e-mail address that I learned, based on my investigation, was a personal e-mail address of the Secretary General of INTERPOL, along with a suggestion that the Secretary General adopt SICILIANO's suggestion.

p.  The next day, on or about November 12, 2009, SICILIANO wrote to CC-2 that he would confer with the Secretary General of INTERPOL in order to get INTERPOL's passport approved: "I received a note from [the Secretary General of INTERPOL] yesterday.  I think I found a way to fast track processing the issuance of the three letter code[6] to Interpol.  I will propose to him to send us a request for getting the three-letter code, along with letters of acceptance of the Laissez-Passer (that will grant visa waiver status) from States that already are supporting the initiative.  With this, I can try to build a strong case, and it will probably very quickly.  However, this initiative will be fought and opposed by some TAG members (such as the Canadian Delegation, as you may expect).  But, I am confident we can do this.  I will inform [the Secretary General of INTERPOL ] how to proceed."

q.  On or about December 11, 2009, SICILIANO advised CC-2 that he (SICILIANO) had received a letter from the Secretary General of INTERPOL about getting a three-letter code and advising that some states, such as Canada, Australia, and New Zealand, will oppose.  SICILIANO assured CC-2 that he (SICILIANO ) will help facilitate the process.

r.  On or about January 21, 2010, SICILIANO wrote to CC-2:  "I am very keen to talk to you on the different projects coming up, including INTERPOL ID ecard and receive the fruits our marketing agreement.  Regarding the latter, if it is impossible for you to meet with me in the coming weeks, I wonder if it is possible for you to leave the dues somewhere for me to pick up (ex. bank box, or other alternative), or to assign any of your employees ([Female First Name1] or [Female First Name2]) to provide me with the envelope."  I believe that the "latter" subject referenced in the e-mail related to the payment of a bribe to SICILIANO for his assistance.

s.  On or about January 25, 2010, SICILIANO wrote to CC-2 and proposed that they talk via Internet "chat."  Appended to this e-mail was another e-mail, dated January 3, 2010, sent from SICILIANO to CC-2, which complained of late payments from CC-2 and sought payment from CC-2: "I would not like to let too much time to go by between our meetings and exchanges.

---

[6] Based on my investigation, I learned that ICAO assigns a three letter code to identify the issuing organization or country on a passport or travel document.  This three-letter code is a mandatory component of the Machine Readable Zone standard established by ICAO.  As set forth below, the INTERPOL passport was eventually assigned the code "XPO" by ICAO.

The last time we let this happen, it turn out that we did not continue our marketing agreement and I was the one that really lost.. Thus, I would like to know if you or [the Witness] (whom I have not heard from since the last time we spoke over the phone) will be visiting me to get from you the update. With January, 3 months are due.[7] The other alternative is to use a Bank account I have in Switzerland. In fact, I would prefer this alternative as we may be up to date every month (and not let too much time pass by between encounters), and I can keep the minimum balance I need to keep the account there. Also, this will allow me to use the funds immediately. We may also use this account for other business agreements as they will become available."

        t.   On or about April 14, 2010, SICILIANO wrote to CC-2 and advised CC-2 that the INTERPOL passport will get ICAO's three-letter code without opposition.  Later that day, SICILIANO sent another e-mail to CC-2: "This is to let you know that INTERPOL will officially get their three-letter code XPO.  No opposition was received, on the contrary, based on the arguments put forward by ICAO, it got quite a great support.  Congratulations and let the business grow and continue!"  CC-2 later responded: "Thank you very much for these excellent news that would not be there if it was not for your whole-hearted and intensive support!"

        u.   On or about June 4, 2010, SICILIANO wrote to CC-2, apparently upset: "Here's a copy of the letter sent to [the Secretary General of INTERPOL] today.  This completes my side of the deal, which I fulfilled thoroughly and professionally.  Unfortunately, yours and [CC-1]'s were not."  Attached to SICILIANO's e-mail was a signed copy of a letter dated June 3, 2010, from the Secretary General of ICAO to the Secretary General of INTERPOL stating that ICAO was pleased to announce that the three letter passport code "XPO" was assigned to INTERPOL. CC-2 replied, asserting that SICILIANO was upset over a misunderstanding and that everything had been done "for free."[8]  In response, SICILIANO replied:

        I see.

        It is very unfortunate that I started all this with [the Witness], whom, SPECIFICALLY, told me to support this project 100%, and with whom I SPECIFICALLY agreed upon with the respective monthly return (amounts that I had to recall to you recently).  Then he was substituted by you, whom reinforce the request to provide 100% support to the project until full implementation (you did this during the Symposium, and I was given guarantees of retribution[9] by you.  However, I can appreciate that you do not remember).  During the same week I also managed to get you with our Secretary General during teh [sic] PKD Board meeting (for you, this is priceless)  Then, the terms of our agreement remained

---

[7] Notably, the Witness was arrested approximately three months prior to this e-mail for the crimes to which he eventually pleaded guilty and could not make payments to SICILIANO, which is consistent with SICILIANO's complaint that "3 months are due."

[8] Based on my investigation and read in context, I believe that CC-2's assertion that he thought everything was done "for free" was an attempt to distance himself from SICILIANO in light of SICILIANO's apparent anger.

[9] SICILIANO resides in Montreal, a French-speaking part of Canada, and based on my review of his e-mail messages, I believe that he sometimes confused French and English words.  In particular, I believe that in this e-mail message, SICILIANO erroneously confused the English word "retribution" for the French word "*rétribution*," which means "payment," and which would made more sense in the context of the message.

unchanged (or so I thought ...) In fact, we spoke several times to
get together to exchange retributions, and every time you said that
it would happen soon ... either in Dubai or London. Then, the last
time we exchanged everything was new to you (and [CC-1]) ... like
if we have never talked or agreed upon anything.

I guess you understand how unpleasantly surprised I was ...

This obvious misunderstanding is due to the fact that we do not
keep the exchanges in writing, or that I do not speak directly to
[CC-1]. Having Intermediaries has always been a problem in our
relationship. But it is obvious this will never change.

This experience with you has taught me few lessons: 1) to define
the scope of jobs in writing; 2) to agree and get sign off on the
jobs; 3) to get paid before executing (at least a great portion of it).

I will not plead my case before you again (I do not need to do it).
But suffice to say that I have learned my lesson with you (I believe
twice already. The second time, shame on me!)

Again good luck with your business.

v. Later, on or about June 4, 2010, SICILIANO sent a further e-mail to CC-2
disputing CC-2's characterization of their relationship and chastising CC-2: "the sudden change
of terms of reference on your side (and consequent memory loss) is due to two factors: 1) the fact
that INTERPOL ePassport project changed in nature and became an eID card, and 2) that
Entrust[10] had to step in due to the lack of capacity for EDAPS to deal with the PKI[11] issue and
the implementation of the project for INTERPOL (or so it was reported to me). Then the project
was taken over by Entrust, and you were (temporarily) taken out of the picture (or so it seemed).
These changes in the nature of the project happened over a period of 8 months. And it took me
all this time and two missions to Lyon [where INTERPOL is headquartered] to 'purify' the
concept and the process, and make it transparent and acceptable to ALL parties and States. I
went from a 'no-go' to a 'go' project. Let alone, the coaching I have provided to INTERPOL to
establish and execute a winning project."

8. In addition to providing assistance to CC-1 and CC-2 directly in their business affairs,
the e-mail messages also suggest that SICILIANO was using his position within ICAO to help
CC-2 with other matters, notably getting travel documents through ICAO's sponsorship. For
instance, on or about November 6, 2007, SICILIANO sent an e-mail to CC-2, stating: "Please
send me the dates you and [Female Name] will be in Canada, so I can request the visa." Based
on my investigation, I believe that the female referenced by SICILIANO was CC-2's girlfriend.
Indeed, two days later, on or about November 8, 2007, SICILIANO sent an e-mail to CC-2
advising CC-2: "We just faxed to the Canadian Consulate in Dubai [where CC-2 resided] the
letter I am attaching here for getting the visa to your girlfriend." SICILIANO also prepared a
plan for "MRTD Training Strategy, as discussed with [CC-1] and yourself," and stated that "it
seems I may have the possibility to 'hire' [CC-1] (among other consultants) as an ICAO

---

[10] Based on my investigation, I believe that "Entrust" referred to Entrust, Inc., a software company that
specializes in security software for businesses, governments, and other enterprises.

[11] Based on my investigation, I believe that "PKI" referred to "public key infrastructure," which, generally
speaking, is any system to transfer information securely through an otherwise unsecure network.

consultant and provide him with a *Laisser Passer* as he wishes." SICILIANO also sought payment for his assistance, writing: "Finally, I will need to have access to my monthly dues from you ASAP. Last payment received was in September. I am opening a Swiss account shortly where you may wire the money."

9.   Moreover, the e-mail messages involving SICILIANO also suggest that CC-1 and CC-2 procured employment for SICILIANO's Son in exchange for SICILIANO's favor. Notably:

a.   On or about October 4, 2007, CC-2 received via e-mail the Son's *curriculum vitae*. Four days later, on or about October 8, 2007, SICILIANO wrote to CC-2, stating, "none of my family members know or I want them to ever know, about my deals with you." SICILIANO noted that his Son "is also very discreet" and he acknowledged that whatever offer was pending "is a great deal." However, SICILIANO also explained, "But I cannot tell any of this to anyone. This has to be seen as a good opportunity for him, based on his qualities....The problem here is with me and my wife, the girlfriend and her family, whom see with suspicion the fact that a company dealing in domain of travel documents make such a 'good' offer to our son, without giving more information and requiring from me nothing in exchange....I will prefer for [the Son] not to be involved with travel documents business....It will not look good for any of us at this point."

b.   On or about October 16, 2007, SICILIANO sent an e-mail to CC-2 expressing continued concern about the employment offer to his Son. In response, CC-2 wrote back that: "The offer that I gave [the Son] is based on his merits....I'm convinced [the Son] is ideal for what we need from him and what we can offer him. So it is mutually beneficial scenario." The next day, on or about October 17, 2007, SICILIANO wrote back: "I only requested you to help me (give me arguments) to support at home this wonderful opportunity for [the Son]. And with this you did....You know, I believe this relationship is for the long run, even for myself. I believe in the business and in the business model being implemented. Count on me for developing it and making it a great success."

c.   On or about October 30, 2007, in response to the Son's request to "Please put name as '[Same First Name, Different Last Name]' on business cards," CC-2 sent an e-mail to CC-1 and other EDAPS employees directing them: "PLEASE USE – [Same First Name, Different Last Name] (NOT – Siciliano)." Based on my experience, training, and investigation of this matter, I believe that the Son's request to use a name other than his own in his employment with CC-1 and CC-2 indicates that the Son was concerned about the appearance of a conflict of interests.

d.   After starting his job, the Son was apparently not happy with it. On or about November 10, 2007, CC-2 sent an e-mail to SICILIANO stating that he could not comment on the attached e-mail from the Son. The attached e-mail to which CC-2 referred, in turn, was an e-mail from the Son to CC-2, stating that he (the Son) was quitting his job and returning from Dubai to Montreal. The Son explained: "I had felt panicked at the idea that I have left alot behind in Montreal within two weeks on an offer you made me, also my father did somewhat take a risk by getting me hired by a company he was looking to push even before we met. I was aware of all this, but I also needed some sort of assurance that this would go as you had told my father....Also I do not want this to interfere between your relationship with my father or for you to get the wrong impression."

e.   In response, on or about November 21, 2007, SICILIANO, via e-mail, expressed his own displeasure at his Son's apparent unhappiness and sought compensation from CC-2: "He [the Son] was to have a contract in writing that will include his job description indicating his position and functions, which you identified as 'Back Manager'....When it comes to [the Son's]

job, he end up not performing functions of 'Back Manager' as indicated. Instead, he had to be available for performing functions as driver or something closer to been a personal butler....Finally, when it comes to compensate [the Son], I think this is something your company will have to fix directly with him. No invoices, no paper trail. And for everything he had lost because he accepted in good faith an offer that did not follow through, and to help him come back on his own in some way, I expect him to be substantially compensated. I believe three months salary should be the right thing to do. As for the future plans, I will send you a fax, once this situation is satisfactorily resolved and behind us." Later on November 21, 2007, CC-1 (who identified himself), using CC-2's e-mail account, wrote the following to SICILIANO: "I have read your email of 21 November. I am expecting receipt of bank account information from [the Son]." Appended to CC-1's e-mail was an e-mail sent from the Son to SICILIANO and CC-2. In that appended email, the Son wrote: "I was hired, apparently, because of my language skills, ease of travel and other similar aptitudes as was discussed when you, [CC-1], [CC-2], [the Witness] and I were present. However, none of those were really ever useful....spent the better part of my stay working as a driver....I was to be hired by a company named GDS coproration [sic], but the plan had changed to my being hired by EDAPS Overseas and in retrospect I dont think it is a good idea given my father's position, especially if we agreed that both things were to have no link in any way because they were not cause and consequence....I now see that there was no hurry for me to come to Dubai in under three weeks as there was not really anything for me to do there." Based on the Son's complaints about his job, I believe that CC-1 and CC-2 gave him a job that served no real purpose except to curry favor with the elder SICILIANO. Moreover, based on the elder SICILIANO's demand for compensation for his son --- and his warning, "No invoices, no paper trial" --- and CC-1's apparent willingness to pay this compensation, I believe that the Son's employment and subsequent severance package was merely another benefit given to curry official favor from the elder SICILIANO.

   f. Still later on November 21, 2007, SICILIANO wrote to CC-1 at CC-2's e-mail address, agreeing to put the situation involving the Son behind them. SICILIANO also expressed an interest in expanding projects and requested a point of contact who was better available, such as the Witness. SICILIANO ended his message with: "From now on, please keep my family out of the communication channels. This include no phone calls at home."

   10. Based on my investigation, as noted above in footnote 2, I know that Google, Inc., is the service provider for gmail, that Google, Inc., is headquartered in Mountain View, California, and that Google maintains e-mail servers there and elsewhere. At least thirty of the e-mail exchanges relevant to the bribery scheme discussed above passed through the Google server "mx.google.com" which is located in the Northern District of California. Accordingly, a significant number of e-mail communications that facilitated the commission of the crimes described herein traveled to and through the Northern District of California.

## CONCLUSION

11. Based on the forgoing, I respectfully submit that there is probable cause to believe that MAURICIO SICILIANO has violated Title 18, United States Code, Sections 1343, 1349, 1346, 371, 666(a)(1)(B) & (a)(2), and 2, and I therefore request that a warrant be issued for his arrest for these crimes.

K.S. BAGCHI
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 28ʰ day of May, 2014

HON. JACQUELINE SCOTT CORLEY
United States Magistrate Judge