1  MELINDA HAAG (CABN 132612)
   United States Attorney

2

3  DAVID R. CALLAWAY (CABN 121782)
   Chief, Criminal Division

4  DAMALI A. TAYLOR (CABN 251287)
   W.S. WILSON LEUNG (CABN 190939)

5  Assistant United States Attorneys

6  IVANA DUKANOVIC
   Law Clerk

7
        450 Golden Gate Avenue, Box 36055
8       San Francisco, California 94102
        Telephone: (415) 436-6758
9       Facsimile: (415) 436-6753
        E-Mail: wilson.leung@usdoj.gov

10
   Attorneys for the United States of America

11

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                 SAN FRANCISCO DIVISION

15

16  UNITED STATES OF AMERICA          )   No. 14-CR-00341-CRB
                                      )
17          v.                        )   GOVERNMENT'S RESPONSE
                                      )   TO DEFENDANTS' MOTIONS TO DISMISS
18  ALEXANDER VASSILIEV and           )
    MAURICIO SICILIANO,               )   Hearing:  April 15, 2015
19                                    )   Time:  2:00 pm
            Defendants.               )   Court:  Hon. Charles R. Breyer
20                                    )
    _____ )

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2  I.    Introduction ........................................................................................................1

3  II.   The Indictment .................................................................................................1

4  III.  Discussion ........................................................................................................3

5        A.    Generally Applicable Law ................................................................3

6        B.    The Wire Fraud and Federal Program Bribery Statutes Apply Extraterritorially...............4

7              1.    Applicable Law Regarding Extraterritoriality ........................................4

8              2.    Wire Fraud and Federal Program Bribery Fall Under <u>Bowman</u>.............................9

9              3.    Congress Affirmatively Expressed the Intent that Wire Fraud and
                     Federal Program Bribery Can Be Prosecuted Extraterritorially ...........................12

10

11       C.    Prosecution of the Defendants in the United States Does Not Violate Due
                Process ........................................................................................14

12       D.    The Wire Fraud Related Charges Are Properly Pled........................................15

13       E.    The Federal Program Bribery Related Charges Are Properly Pled .................................18

14       F.    Siciliano Does Not Enjoy Immunity from Prosecution ....................................19

15  IV.   Conclusion ........................................................................................22

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ................................................ 3

*Costello v. United States*, 350 U.S. 359 (1956) ..................................................................... 3

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) ....................................................... 5

*European Community v. RJR Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014)........................ 10, 11

*Morrison v. National Australia Bank, Ltd.*, 130 S. Ct. 2869 (2010)................................... 5, 11

*Pasquantino v. United States*, 544 U.S. 349 (2005) ............................................................... 13

*Sabri v. United States*, 541 U.S. 600 (2004) ......................................................................... 9

*Salinas v. United States*, 522 U.S. 52 (1997)............................................................ 9, 12, 18, 20

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ............................................... 14, 15

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ....................................................... 9, 10, 20

*United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010) ......................................................... 7

*United States v. Berger*, 473 F.3d 1080 (9th Cir. 2007) .......................................................... 4

*United States v. Boren*, 278 F.3d 911 (9th Cir. 2002) ............................................................. 4

*United States v. Bowman*, 260 U.S. 94 (1922).............................................................. 5, 6, 7, 8

*United States v. Braverman*, 376 F.2d 249 (2d Cir. 1967) ..................................................... 13

*United States v. Brehm*, 691 F.3d 547 (4th Cir. 2012)............................................................ 15

*United States v. Buchmeier*, 255 F.3d 415 (7th Cir. 2001)............................................... 16, 18

*United States v. Campbell*, 798 F. Supp.2d 293 (D.D.C. 2011) ....................................... 8, 9, 10

*United States v. Carson*, 2011 WL 7416875, at *6-7 (C.D. Cal. Sept. 20, 2011)............................................................................................................................. 8

*United States v. Carvajal*, 924 F. Supp.2d 219 (D.D.C. 2013)................................................ 8

*United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013)................................................... 5

*United States v. Corey*, 232 F.3d 1166 (9th Cir. 2000) ........................................................... 6

*United States v. Cotton*, 471 F.2d 744 (9th Cir. 1973) ....................................................... 6, 10

*United States v. Crow*, 824 F.2d 761 (9th Cir.1987) .............................................................. 4

*United States v. D'Amelio*, 682 F.3d 412 (2d Cir. 2012) ....................................................... 16

*United States v. Davis*, 905 F.2d 245 (9th Cir. 1990) ................................................................ 14

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ........................................................ 4

*United States v. Feliz-Gutierrez*, 940 F.2d 1200 (9th Cir. 1991) ............................................ 4, 9

*United States v. Fernandez*, 388 F.3d 1199 (9th Cir. 2004) ..................................................... 4

*United States v. Frank*, 599 F.3d 1221 (11th Cir. 2010) ........................................................ 5, 7

*United States v. Frega*, 179 F.3d 793 (9th Cir. 1999) .............................................................. 16

*United States v. Garlick*, 240 F.3d 789 (9th Cir. 2001) ........................................................... 15

*United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) ......................................................... 13

*United States v. Hernandez*, 980 F.2d 868 (2d Cir. 1992) ....................................................... 4

*United States v. Hijazi*, 845 F. Supp.2d 874 (C.D. Ill. 2011) ............................................. 8, 10

*United States v. Jensen*, 93 F.3d 667 (9th Cir. 1996) .............................................................. 4

*United States v. Kazzaz*, 2014 WL 6679284 (9th Cir. Nov. 26, 2014) .................................... 11

*United States v. Kim*, 246 F.3d 186 (2d Cir. 2001) ............................................................. 11, 13

*United States v. King*, 200 F.3d 1207 (9th Cir. 1999) ............................................................. 4

*United States v. Lawrence*, 727 F.3d 386 (5th Cir. 2013) ........................................................ 7

*United States v. Leija-Sanchez*, 602 F.3d 797 (7th Cir. 2010) ........................................ 7, 8, 11

*United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014) ............................................................. 14

*United States v. Margiotta*, 646 F.2d 729 (2d Cir. 1981) ........................................................ 17

*United States v. McVicker*, 979 F. Supp.2d 1154 (D. Or. 2013) ........................................... 7, 8

*United States v. Mostafa*, 965 F. Supp.2d 451 (S.D.N.Y. 2013) ...................................... 14, 15

*United States v. Ramirez-Martinez*, 273 F.3d 903(9th Cir. 2001), ........................................ 17

*United States v. Robinson*, 651 F.2d 1188 (6th Cir. 1981) ...................................................... 17

*United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) .............................................................. 9

*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2013) ........................................................... 7

*United States v. Thomas*, 893 F.2d 1066 (9th Cir. 1990) ........................................................ 5

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989) ........................................................... 16

*United States v. Vasquez-Velasco*, 15 F.3d 833 (9th Cir. 1994) .............................................. 6

//
GOV'S RESPONSE TO MOTIONS TO DISMISS
14-CR-00341 CRB

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ................................................................. 7

*United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011) ......................................................... 7

*United States v. Woodruff*, 50 F.3d 673 (9th Cir. 1995) ........................................................... 4

*United States v. Wyncoop*, 11 F.3d 119 (9th Cir. 1993) ........................................................... 9

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ................................................. 5, 7, 14, 15

**FEDERAL STATUTES**

18 U.S.C. § 371 ......................................................................................................................... 1

18 U.S.C. § 641 ..................................................................................................................... 6, 10

18 U.S.C. § 666 .............................................................................................................. 1, 2, 9, 12

18 U.S.C. § 1343 ............................................................................................................... passim

18 U.S.C. § 1349 ...................................................................................................................... 1

18 U.S.C. § 1952 .................................................................................................................... 11

18 U.S.C. § 2423 ...................................................................................................................... 7

22 U.S.C. § 287e .................................................................................................................... 10

22 U.S.C. § 288d(b) .......................................................................................................... 20, 21

22 U.S.C. § 2673 ................................................................................................................... 2, 9

**FEDERAL RULES**

Fed. R. Crim. P. 29 .................................................................................................................. 4

Fed. R. Crim. P. 7(c) ..................................................................................................... 4, 15, 18

## I.     Introduction

The Government respectfully submits this response to March 11, 2015 Motions to Dismiss of defendants Alexander Vassiliev and Mauricio Siciliano (Docket ## 32 and 33, respectively).  Both defendants claim that Indictment 14-CR-00341 fails to allege an offense because the wire fraud and federal program bribery crimes charged cannot apply extraterritorially.  Both defendants also claim that the charges against them violate the due process because there is no "domestic nexus."  Both defendants also contend that the wire fraud count fails to state an offense and is duplicitous because it fails to allege a specific use of wires.

Vassiliev further claims that the federal program bribery charges are defective because they fail to allege that the organization allegedly influenced was the organization that received federal funding.  Siciliano, for his part, also contends that the wire fraud charges are defective because they fail to allege an official action.  He also claims that the federal program bribery charge is defective because his corrupt action was not connected to any business or transaction of the International Civil Aviation Organization ("ICAO").  Finally, Siciliano claims that he enjoys immunity from prosecution by virtue of his employment with ICAO and his putative travel on a United Nations travel document, a *laissez-passer*.

For all of the following reasons, the defendants' motions lack merit and should be denied in their entirety.

## II.    The Indictment

On June 24, 2014, the Grand Jury in the Northern District of California returned Indictment 14-CR-00341-CRB, charging Yuri Sidorenko, Alexander Vassiliev, and Mauricio Siciliano in five counts.  See Indictment, Docket #3.  Count One of the Indictment charges the defendants with conspiring to commit honest services wire fraud, in violation of Title 18, United States Code, Section 1349.  Count Two charges the defendants with substantive honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2.  Count Three charges the defendants with conspiring to solicit and to receive bribes relating to a federal program, in violation of Title 18, United States Code, Section 371.  Count Four charges the defendants with soliciting bribes relating to a federal program, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.  Count Five charges the defendants with

giving bribes relating to a federal program, in violation of Title 18, United States Code, Sections 666(a)(2) and 2. See id. ¶¶ 24-37. These charges are based on the defendants' involvement in a bribery scheme spanning from 2005 through 2010 pursuant to which Sidorenko and Vassiliev paid money and provided other consideration to Siciliano in exchange for favorable action by Siciliano in his capacity as an executive in ICAO.

As alleged in the Indictment, ICAO was a specialized agency of the United Nations that was responsible for, among other things, setting standards for machine-readable passports. See id. ¶ 2. The United States was a member of ICAO since ICAO's creation in 1944. See id. ¶ 1. Between 2005 and 2010, ICAO's budget was at least $64 million, and the United States's contributions to ICAO constituted at least 25% of ICAO's entire budget. See id. ¶ 3. The United States's contributions to ICAO were specifically authorized by Congress under Title 22, United States Code, Section 2673. See id. ¶ 3. At all times relevant to the Indictment, Siciliano was an executive at ICAO, who was specifically assigned to work in ICAO's Machine Readable Travel Documents Programme, which set standards for machine-readable passports. See id. ¶ 8.

At all times relevant to the Indictment, Sidorekno and his nephew Vassiliev were principals in EDAPS Consortium ("EDAPS") a Ukrainian conglomerate of various companies that manufactured and supplied a variety of identification and security products, including passports, driver's licenses, airline crew badges, bank cards, tax stamps, voting ballots, negotiable instruments, and holographic embossing. See id. ¶ 4. One of EDAPS's projects during the time period of the Indictment was the attempt to develop an electronic passport for the International Criminal Police Organization ("INTERPOL"). See id.

As alleged in the Indictment, ICAO had an intangible right to the honest services of its employee and executive, Siciliano, and Siciliano owed a duty to ICAO to, *inter alia*, refrain from receiving illegal payments and other things of value that improperly affected the performance of official duties and coaxed favorable official action and inaction, and refrain from using his office and knowledge gained from his official functions for the private gain of himself and any third parties. See id. ¶ 9. Despite these duties to ICAO, however, from at least 2005 through 2010, Siciliano solicited and received bribe payments and other things of value from Sidorenko and Vassiliev in exchange for Siciliano using his

1  official position at ICAO to perform actions benefitting Sidorenko, Vassiliev, and EDAPS by bolstering

2  EDAPS's international reputation and marketing efforts.  Some of these corrupt actions are reflected in

3  e-mail messages between the defendants, including, for instance, e-mail messages in which Siciliano

4  recommended EDAPS for a project for an international organization, see id. ¶ 11, discussed the revision

5  of an endorsement letter for EDAPS, see id. ¶ 13, advised Vassiliev that Siciliano found a way to "fast

6  track" the assignment of an ICAO code for EDAPS's prototype electronic passport for INTERPOL, see

7  id. ¶ 14, and notified Vassiliev that Siciliano, using ICAO letterhead, had requested a Canadian visa for

8  Vassiliev's girlfriend, see id. ¶ 15.  The e-mail messages also reflected Siciliano's demands for payment

9  from Sidorenko and Vassiliev.  See id. ¶¶ 18, 19, 22.

10  Vassiliev was arrested in Switzerland in or about mid-2014 and has been ordered extradited to

11  the United States.  Siciliano was arrested on or about December 11, 2014 in the United States and is

12  presently on pre-trial release.

**III.   Discussion**

14  The defendants present the following seven claims: (1) the five counts of the Indictment must be

15  dismissed because the crimes alleged have no extraterritorial application; (2) the crimes alleged violate

16  due process because they have no nexus to the United States; (3) the wire fraud charges are defective

17  because they fail to allege specific wires; (4) the federal program bribery charges are defective because

18  they fail to allege that the organization influenced – ICAO – received federal funding; (5) the wire fraud

19  charges are defective because they fail to allege an official action; (6) the federal program bribery

20  charges are defective because Siciliano's corrupt actions were not connected to any business or

21  transaction of ICAO; and (7) Siciliano enjoys immunity from prosecution.  None of these claims has

22  merit and the defendants' motions should be denied.

**A.   Generally Applicable Law**

24  On a pretrial motion to dismiss pursuant to Fed. R. Crim. 12(b), the allegations of the indictment

25  must be viewed as a whole and taken as true.  See Boyce Motor Lines, Inc. v. United States, 342 U.S.

26  337, 343 n. 16 (1952).  The law is well-settled that "[a]n indictment returned by a legally constituted and

27  unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits."

28  Costello v. United States, 350 U.S. 359, 365 (1956).  A defendant must wait until after the close of the

1  Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the

2  evidence.  <u>See</u> Fed. R. Crim. P. 29.  A pretrial motion to dismiss an indictment is not a permissible

3  vehicle for disputing the sufficiency of the Government's evidence.

4       Rule 7(c) of the Federal Rules of Criminal Procedure, which governs the type of information that

5  must be contained in an indictment, provides that the indictment "shall be a plain, concise and definite

6  written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  The

7  Ninth Circuit has held that "an indictment setting forth the elements of the offense is generally

8  sufficient."  <u>United States</u> v. <u>Fernandez</u>, 388 F.3d 1199, 1220 (9th Cir. 2004); <u>see</u> <u>United States</u> v.

9  <u>Woodruff</u>, 50 F.3d 673, 676 (9th Cir. 1995) ("In the Ninth Circuit, '[t]he use of a "bare bones"

10  information – that is one employing the statutory language alone – is quite common and entirely

11  permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime

12  to be punished.'") (<u>quoting</u> <u>United States</u> v. <u>Crow</u>, 824 F.2d 761, 762 (9th Cir.1987)).  The dismissal of

13  an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances

14  implicating fundamental rights."  <u>United States</u> v. <u>De La Pava</u>, 268 F.3d 157, 165 (2d Cir. 2001)

15  (citation omitted).  In addition, the Ninth Circuit has instructed that when considering a motion to

16  dismiss an indictment, the indictment "should be read in its entirety, construed according to common

17  sense, and interpreted to include facts which are necessarily implied."  <u>United States</u> v. <u>Berger</u>, 473 F.3d

18  1080, 1103 (9th Cir. 2007), citing <u>United States</u> v. <u>King</u>, 200 F.3d 1207, 1217 (9th Cir. 1999); <u>see</u>

19  <u>United States</u> v. <u>Hernandez</u>, 980 F.2d 868, 871 (2d Cir. 1992) (holding that when deciding a motion to

20  dismiss, the indictment should be read "in its entirety").  The evidence that the Government will

21  introduce at trial to prove the defendant's guilt is irrelevant.  <u>See</u> <u>United States v. Boren</u>, 278 F.3d 911,

22  914 (9th Cir. 2002); <u>United States v. Jensen,</u> 93 F.3d 667, 669 (9th Cir. 1996).

23      **B.**    **The Wire Fraud and Federal Program Bribery Statutes Apply Extraterritorially**

24       Both defendants contend that the Court should dismiss the Indictment against them because the

25  crimes charged cannot apply extraterritorially.  This claim is meritless.

26      **1.**    **Applicable Law Regarding Extraterritoriality**

27       "Generally, there is no constitutional bar to the extraterritorial application of United States penal

28  laws."  <u>United States</u> v. <u>Feliz-Gutierrez</u>, 940 F.2d 1200, 1204 (9th Cir. 1991).  "It is beyond doubt that,

1   as a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries

2   of the United States.'"   United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (quoting EEOC v.

3   Arabian American Oil Co., 499 U.S. 244, 248 (1991), superseded by statute on other grounds).   Rather,

4   the extraterritorial reach of a criminal statute is a question not of authority, but of statutory

5   interpretation.   See United States v. Thomas, 893 F.2d 1066, 1068 (9th Cir. 1990); see also Morrison v.

6   National Australia Bank, Ltd., 130 S. Ct. 2869, 2877 (2010) (noting that presumption against

7   interpreting a statute to have extraterritorial application is a "canon of construction, or a presumption

8   about a statute's meaning, rather than a limit upon Congress's power to legislate").   "Congress has the

9   power to apply its laws extraterritorially, but whether it has done so is a matter of statutory construction

10  that is subject to plenary review."   United States v. Frank, 599 F.3d 1221, 1230 (11th Cir. 2010).

11         In 2010, the Supreme Court decided Morrison v. National Australia Bank, Ltd., 130 S. Ct. 2869

12  (2010), which held that § 10(b) of the Securities Exchange Act of 1934 did not have extraterritorial

13  reach in a civil action.   See 130 S. Ct. at 2883.   In so doing, Morrison reiterated the long-standing

14  presumption against interpreting United States statutes to have extraterritorial reach: "'unless there is the

15  affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must

16  presume it is primarily concerned with domestic conditions.'"   Id. at 2877 (quoting Arabian American

17  Oil Co., 499 U.S. at 248).   Morrison also held, however, that congressional intent regarding

18  extraterritoriality can be found not only in the text of statute, but in other materials:   "[W]e do not say

19  . . . that the presumption against extraterritoriality is a 'clear statement rule,' if by that is meant a

20  requirement that a statute say 'this law applies aboard.'   Assuredly context can be consulted as well."

21  130 S. Ct. at 2883 (citation omitted).   Although Morrison specifically dealt with the civil provisions of

22  the Securities Exchange Act, the Ninth Circuit has applied Morrison to determine that criminal RICO

23  does not have extraterritorial application.   See United States v. Chao Fan Xu, 706 F.3d 965, 974 (9th

24  Cir. 2013).

25         Morrison, however, is not the Supreme Court's only teaching regarding the extraterritorial

26  application of statutes.   In 1922, the Supreme Court in United States v. Bowman, 260 U.S. 94 (1922),

27  considered whether a statute criminalizing conspiracy to defraud a corporation in which the United

28  States was a stockholder was to be applied extraterritorially.   The Bowman Court explained that, for

1    crimes involving private individuals and property, there was a presumption against extraterritoriality,

2    which could be overcome by an expression of congressional intent to have the law apply

3    extraterritorially:

> Crimes against private individuals or their property, like assaults, murder, burglary,
> larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace
> and good order of the community must, of course, be committed within the territorial
> jurisdiction of the government where it may properly exercise it.  If punishment of them
> is to be extended to include those committed outside the strict territorial jurisdiction, it is
> natural for Congress to say so in the statute, and failure to do so will negative the purpose
> of Congress in this regard.

8    260 U.S. at 98.

9    Bowman also held, however, that the presumption against extraterritoriality does not apply at all

10   to

> criminal statutes which are, as a class, not logically dependent on their locality for the
> government's jurisdiction, but are enacted because of the right of the government to
> defend itself against obstruction, or fraud wherever perpetrated, especially if committed
> by its own citizens, officers, or agents.  Some such offenses can only be committed
> within the territorial jurisdiction of the government because of the local acts required to
> constitute them.  Others are such that to limit their locus to the strictly territorial
> jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave
> open a large immunity for frauds as easily committed by citizens on the high seas and in
> foreign countries as at home.  In such cases, Congress has not thought it necessary to
> make specific provision in the law that the locus shall include the high seas and foreign
> countries, but allows it to be inferred from the nature of the offense.

17   Id.

18   Numerous courts over the years have read Bowman to hold that the presumption against reading

19   a statute to have extraterritorial application does not apply to the interpretation of criminal statutes that

20   implicate the interests of the United States abroad, or that address crimes that, by their nature, need to

21   reach beyond the territory of the United States in order to be effective.  See, e.g., United States v. Corey,

22   232 F.3d 1166, 1170 (9th Cir. 2000) (holding "in United States v. Bowman, 260 U.S. 94, 98 (1922), the

23   Supreme Court held that the territorial presumption does not govern the interpretation of criminal

24   statutes that, by their nature, implicate the legitimate interests of the United States abroad"); United

25   States v. Vasquez-Velasco, 15 F.3d 833, 839 (9th Cir. 1994) (holding that courts "may infer that

26   extraterritorial application is appropriate from the nature of the offenses and Congress's other legislative

27   efforts to eliminate the type of crime involved") (internal citation and quotation marks omitted); United

28   States v. Cotton, 471 F.2d 744, 750 (9th Cir. 1973) (holding that although 18 U.S.C. 641 "does not

express the scope of its application," applying <u>Bowman</u> and holding that "we find strong evidence that the section was intended to have extraterritorial application.  It is inconceivable that Congress, in enacting Section 641, would proscribe only the theft of government property located within the territorial boundaries of the nation."); <u>United States</u> v. <u>Weingarten</u>, 632 F.3d 60, 66 (2d Cir. 2011) ("In <u>United States</u> v. <u>Bowman</u>, [260 U.S. 94 (1922)], the Supreme Court indicated that 'Congress is presumed to *intend* extraterritorial application of criminal statutes where the nature of the crime does not depend on the locality of the defendants' acts and where restricting the statute to United States territory would severely diminish the statute's effectiveness.'") (emphasis in original) (quoting <u>Yousef</u>, 327 F.3d at 87 (in turn, citing <u>Bowman</u>)); <u>United States</u> v. <u>Leija-Sanchez</u>, 602 F.3d 797, 798 (7th Cir. 2010) ("What <u>Bowman</u> had said is that 'the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction.' [quoting <u>Bowman</u>].  Civil decisions such as <u>Aramco</u> [<u>Arab American Oil Company</u>] cannot implicitly overrule a decision holding that criminal statutes are applied differently."); <u>Frank</u>, 599 F.3d at 1230 ("Crimes fall under the <u>Bowman</u> exception [against presumption of non-extraterritoriality] when limiting their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens . . . in foreign countries as at home.") (citations and internal quotation marks omitted, ellipses in original).

Bowman, of course, has never been overruled and remains valid law post-<u>Morrison</u>.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Lawrence</u>, 727 F.3d 386, 394 (5th Cir. 2013) (post-<u>Morrison</u>, holding that 21 U.S.C. § 959(b) applies extraterritorially based on statutory language as well as under <u>Bowman</u>); <u>United States</u> v. <u>Vilar</u>, 729 F.3d 62, 72-73 (2d Cir. 2013) (explaining how the teachings of <u>Bowman</u> and <u>Morrison</u> are consistent); <u>United States</u> v. <u>Siddiqui</u>, 699 F.3d 690, 700-01 (2d Cir. 2013) (post-<u>Morrison</u>, applying <u>Bowman</u> to hold that 18 U.S.C. §§ 1114, 111, and 924(c) apply extraterritorially); <u>Weingarten</u>, 632 F.3d at 65-67 (holding that 18 U.S.C. § 2423(b) clearly indicated that Congress meant it to apply extraterritorially under <u>Morrison</u> and that under <u>Bowman</u>, "there is reason to doubt that the presumption against extraterritoriality applies to § 2423(b) at all"); <u>United States</u> v. <u>Belfast</u>, 611 F.3d 783, 813-14 (11th Cir. 2010) (post-<u>Morrison</u>, applying <u>Bowman</u> to hold that 18 U.S.C. § 924(c) applies extraterritorially if predicate crime does as well); <u>United States</u> v. <u>McVicker</u>, 979 F. Supp.2d 1154, 1171

(D. Or. 2013) (post-Morrison, applying Bowman and holding that 18 U.S.C. § 2251(a) applied extraterritorially); id. n. 1 ("In the civil context, the Supreme Court has articulated a presumption against the extraterritorial application of statutes that can only be overcome by a clear indication of congressional intent. [citing Morrison]. The last time the Supreme Court addressed the extraterritorial reach of penal statutes, however, it held that 'the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction. . . .' [quoting Bowman]. The United States Courts of Appeal have applied Bowman to the interpretation of criminal statutes with varying degrees of liberality. [citing law review article]. This Court is bound by the Ninth Circuit's broad application of the Bowman exception in criminal cases . . . ."); United States v. Carvajal, 924 F. Supp.2d 219, 240 (D.D.C. 2013) (post-Morrison, holding that "[t]he presumption against extraterritoriality does not apply to criminal statutes that are 'not logically dependent on their locality for the government's jurisdiction.'") (quoting Bowman, 260 U.S. at 98-99); United States v. Hijazi, 845 F. Supp.2d 874, 887 (C.D. Ill. 2011) ("An exception to the presumption [against extraterritoriality] has been described in United States v. Bowman, 260 U.S. 94 (1922). . . .The practical result of Bowman's holding is that 'judges must consider the language and function of the prohibition' in determining the extraterritorial reach of a criminal statute.") (quoting Leija-Sanchez, 602 F.3d at 799); United States v. Campbell, 798 F. Supp.2d 293, 303 (D.D.C. 2011) (acknowledging Morrison but holding that "Bowman has not been overruled or explicitly limited by any subsequent Supreme Court decision, and it has been cited and applied by circuit courts multiple times in recent years."); United States v. Carson, 2011 WL 7416875, at *6-7 (C.D. Cal. Sept. 20, 2011) (post-Morrison, holding that "consistent with Bowman, criminal statutes may apply extraterritorially even without an explicit Congressional statement" and holding that 18 U.S.C. § 1952 has extraterritorial reach); id. at *7 ("Morrison does not mention Bowman, nor does it explicitly overrule it. Bowman must be followed until the Supreme Court overrules it."). Accordingly, under Morrison and Bowman, a criminal statute is presumed not to apply extraterritorially unless: (1) Congress has affirmatively expressed the intent that it is to have extraterritorial application; or (2) the statute involves offenses that "are, as a class, not logically dependent on their locality for the government's jurisdiction." Bowman, 260 U.S. at 98.

Given these principles, the defendants' challenge to the extraterritorial application of the wire

1   fraud and federal program bribery statutes must fail.[1]

2   **2.   Wire Fraud and Federal Program Bribery Fall Under <u>Bowman</u>**

3       First, the wire fraud and the federal program bribery statutes fall under <u>Bowman</u>, that is, they

4   criminalize conduct that is "not logically dependent on their locality for the government's jurisdiction."

5   Accordingly, they apply extraterritorially even absent any indication they do so.

6       Title 18, United States Code, Section 666, in relevant part, prohibits bribery involving an agent

7   of an organization that receives more than $10,000 under a Federal program in any one year period

8   relating to any business of the organization valued at $5,000 or more.  <u>See</u> 18 U.S.C. § 666.  Section 666

9   was passed in order to "'protect the integrity of the vast sums of money distributed through Federal

10  programs from theft, fraud, and undue influence by bribery.'"  <u>Sabri</u> v. <u>United States</u>, 541 U.S. 600, 606

11  (2004) (quoting S. Rep. No. 98-225, at 370 (1983)); <u>see</u> <u>United States</u> v. <u>Wyncoop</u>, 11 F.3d 119, 122

12  (9th Cir. 1993) (holding that purpose of § 666 was to "protect the integrity of federal funds"); <u>United

13  States</u> v. <u>Rooney</u>, 37 F.3d 847, 851 (2d Cir. 1994) (explaining that "§ 666's manifest purpose is to

14  safeguard finite federal resources from corruption"); <u>Campbell</u>, 798 F. Supp.2d at 304 (same); <u>see also</u>

15  <u>Salinas</u> v. <u>United States</u>, 522 U.S. 52, 58 (1997) (holding that § 666 was intended to "*extend federal

16  bribery* prohibitions to bribes offered to state and local officials employed by agencies receiving federal

17  funds") (emphasis added).  Section 666, therefore, falls squarely within <u>Bowman</u>'s reach.  The United

18  States has been a member of ICAO since ICAO's founding in 1944, and the United States, during the

19  years relevant to the Indictment, has contributed tens of millions of dollars to ICAO, roughly 25% of

20  ICAO's budget, which was specifically authorized by Congress via 22 U.S.C. § 2673.  In addition, the

21  United States's participation in ICAO serves several critical policy considerations, including setting

22  standards for travel documents, which implicates border security and national security.  Accordingly,

23  ICAO is paid pursuant to a Federal program under § 666, <u>see</u> <u>United States</u> v. <u>Bahel</u>, 662 F.3d 610, 627

24  (2d Cir. 2011) (holding that the United Nations was paid under a Federal program for purposes of § 666

25

26  _____

[1] Because the extraterritoriality of a conspiracy is based on the extraterritoriality of the underlying
27  substantive offense, <u>see</u> <u>United States</u> v. <u>Felix-Gutierrez</u>, 940 F.2d 1200, 1205 (9th Cir. 1991) ("We
have inferred extraterritorial application of conspiracy statutes on the basis of a finding that the
28  underlying substantive statutes reach extraterritorial offenses."), this Response addresses the
extraterritoriality issue only with respect to the substantive statutes, <u>i.e.</u>, 18 U.S.C. § 1343 and § 666.

because the United States' funding of the United Nations was based on a specific statute, the United

Nations Participation Act, 22 U.S.C. § 287e, and thus, payments to the United Nations were made under

a "'specific statutory scheme' that aims to advance the government's foreign policy objectives. . . ."); id.

at 629 ("[t]he U.N. is not a contractor and funding to the U.N. is not merely payment for goods and

services provided to the United States. Rather, the funding provided to the U.N. by the United States

fulfills 'significant purposes beyond performance of an immediate transaction,' including the

advancement of policy goals"), and § 666's reach should be read expansively to enable the statute to

protect the federal money wherever it goes, consistent with Bowman. See Campbell, 798 F. Supp.2d at

302-04 (holding that § 666 falls under Bowman exception and applies extraterritorially because its

"design was generally to protect the integrity of the vast sums of money distributed through Federal

programs from theft, fraud, and undue influence by bribery"). In Cotton, the Ninth Circuit held that

although 18 U.S.C. § 641 (prohibiting theft of United States property) did not "express the scope of its

application," the statute nevertheless applied extraterritorially under Bowman because "[i]t is

inconceivable that Congress, in enacting Section 641, would proscribe only the theft of government

property located within the territorial boundaries of the nation." 471 F.2d at 750. Similarly, it strains

logic to conclude that Congress would expand federal bribery protections to federal funds, but limit this

protection only to federal funds within the United States.

Likewise, the wire fraud statute also falls under Bowman. Title 18, United States Code, Section

1343, broadly speaking, criminalizes any "scheme" or "artifice" to defraud that causes the transmission

of wire, radio, or television communication in "interstate" or "foreign" commerce. See 18 U.S.C. §

1343. The crime of wire fraud, thus, is not "logically dependent" on the locality of the conduct, and the

United States has a compelling interest in defending itself against the corruption of a critical

international organization to which it contributes 25% of the organization's budget. See Hijazi, 845 F.

Supp.2d at 887 (holding that wire fraud statute falls under Bowman exception "to the extent that it is

used to prosecute frauds committed against the United States").

The defendants rely heavily on European Community v. RJR Nabisco, Inc., 764 F.3d 129 (2d

Cir. 2014), for their claim that the wire fraud statute does not apply extraterritorially. This reliance is

mistaken. In RJR Nabisco, the Second Circuit applied Morrison to a civil RICO case and held that the

1    civil RICO statute could only apply extraterritorially to the extent that the pattern of racketeering also

2    applied extraterritorially.  See 764 F.3d at 136, 139.  The panel then went on to conclude that the mail

3    fraud, wire fraud, and the Travel Act (18 U.S.C. § 1952) statutes failed to manifest congressional intent

4    that the statutes applied extraterritorially.  See id. at 140-41.

5            RJR Nabisco, however, is inapposite to this case.  First, it addressed a civil action, so its holding

6    should be limited to civil cases.  See Leija-Sanchez, 602 F.3d at 798 ("Civil decisions . . . cannot

7    implicitly overrule a decision holding that criminal statutes are applied differently.").  Second, RJR

8    Nabisco failed to address the Supreme Court's decision Bowman.  Indeed, Bowman is not mentioned at

9    all in RJR Nabisco.  Third, RJR Nabisco also failed to apply Morrison correctly.  The Morrison decision

10   specifically explained that, "we do not say . . . that the presumption against extraterritoriality is a 'clear

11   statement rule,' if by that is meant a requirement that a statute say 'this law applies aboard.'  Assuredly

12   context can be consulted as well."  130 S. Ct. at 2883 (citation omitted).  Contrary to this teaching,

13   however, the RJR Nabisco decision ignores relevant context relating to the wire fraud statute, context

14   that was addressed in a prior Second Circuit decision, United States v. Kim, 246 F.3d 186 (2d Cir.

15   2001), discussed below, which held that § 1343 did apply extraterritorially.  Accordingly, RJR Nabisco

16   can hardly be deemed to be controlling authority on the issue of the extraterritoriality of § 666 and §

17   1343.

18           In addition, the defense correctly acknowledges that the Ninth Circuit has yet to address the issue

19   of whether § 1343 applies extraterritorially and notes that a recent Ninth Circuit case, United States v.

20   Kazzaz, 2014 WL 6679284, at *1 (9th Cir. Nov. 26, 2014), avoided addressing this issue.  However,

21   although Kazzaz did not reach the issue of extraterritoriality for the mail and wire fraud counts presented

22   in the case, it did reach this issue for the counts relating to the Anti-Kickback Act and the conspiracy to

23   defraud counts.  See id. at 2.  Notably, Kazzaz held that these counts applied extraterritorially, and –

24   significantly – relied on Bowman for its holding.  See id.

25           Because § 666 and § 1343 were enacted to address criminal conduct that is "not logically

26   dependent on their locality," the statutes apply extraterritorially under Bowman.

27   //

28

**3.     Congress Affirmatively Expressed the Intent that Wire Fraud and Federal Program Bribery Can Be Prosecuted Extraterritorially**

For the reasons set forth above, § 666 and § 1343 fall under <u>Bowman</u> and, thus, have extraterritorial application.  However, even if the Court were to ignore <u>Bowman</u>, § 666 and § 1343 would still apply extraterritorially under <u>Morrison</u> because the statutes, in context, evinces the intent that they have extraterritorial application.

Section 666 prohibits the following conduct: (1) embezzlement, theft, fraud, and conversion of property owned by, or under the care, custody, or control of "an organization" or "a State, local, or Indian tribal government," by an agent of the organization or the State, local, or Indian government, 18 U.S.C. § 666(a)(1)(A) ; (2) solicitation and demand of a bribe by an agent of the organization or the State, local, or Indian government, <u>see</u> id. § 666(a)(1)(B); and (3) giving, offering, or agreeing to give anything of value to any person with the "intent to influence or reward an agent of an organization or of a State, local or Indian tribal government," <u>id</u>. § 666(a)(2).  Notably, although "government" is specifically limited to State, local, and Indian tribal governments, there is no such limitation for "organization."  In addition, § 666(a)(1)(B) prohibits soliciting or demanding, or agreeing to accept, "anything of value" from "any person" for "the benefit of any person," while § 666(a)(2) prohibits giving, offering, or agreeing to give "anything of value" to "any person" with the "intent to influence or reward an agent of an organization."  Accordingly, the text of the statute clearly conveys the congressional intent that § 666 apply broadly, including reaching any organization that receives the requisite threshold amount of funding from a Federal program, without any limitation due to geography. <u>Cf</u>. <u>Salinas</u>, 522 U.S. at 57 ("[T]he broad definition of the 'circumstances' to which the statute [§ 666] applies provides no textual basis for limiting the reach of the bribery prohibition.  The statute applies to all cases in which an 'organization, government, or agency' receives the statutory amount of benefits under a federal program.").

Similarly, read in its proper context, § 1343 clearly evinces congressional intent to have it apply extraterritorially.  Although the use of the phrase "foreign commerce" by itself may not be sufficient to justify extraterritoriality, it does bear noting that the text of the statute requires that the crime of wire fraud involve the transmission of a communication by means of "wire, radio, or television

communication in interstate or *foreign* commerce. . . ."  18 U.S.C. § 1343 (emphasis added).  In

addition, the legislative history of the statute, which was analyzed by the Second Circuit in Kim, even

more clearly reveals the extraterritorial nature of the statute:

> In 1956, Congress amended the statute to include the words "foreign commerce" so as to reach fraud schemes furthered by foreign wires as well as by interstate wires.  See 18 U.S.C.A. § 1343, Historical and Statutory Notes.  The legislative history of this amendment, while terse, is telling.  The amendment was prompted by the failed prosecution of an individual who made a fraudulent telephone call from Mexico to the United States and successfully argued that § 1343 did not cover such a foreign communication.  See S. Rep. No. 1873, 84th Cong., 2d Sess. 2 (1956).  With this case in mind, Congress acted to "close [the] loophole" that limited prosecution to cases in which the fraudulent transmission occurred between two states, and explicitly extended coverage of § 1343 to foreign communications.  See H.R. Rep. No. 2385, 84th Cong., 2d Sess. 1 (1956). . . .

> As we have recognized in an analogous context:

>> There would seem to be no logical reason for holding that Congress intended to punish those who cause the violation of a law regulating and protecting foreign commerce only when they act within the borders of the United States or that Congress is powerless to protect foreign commerce and those who engage in foreign commerce from intentionally injurious acts, simply because those acts occur outside our borders.

> United States v. Braverman, 376 F.2d 249, 251 (2d Cir. 1967).  We therefore believe that Congress clearly intended conduct such as Kim's to be within the reach of our criminal laws.

Kim, 246 F.3d at 189 (brackets in original).

Significantly, although Kim was decided in 2001, some nine years prior to Morrison, Kim

explained that "the Supreme Court has long recognized a presumption against [extraterritorial]

application" and that this "presumption is overcome . . . when it is clear that Congress intends the statute

to cover conduct that occurs outside the United States."  Id. at 188-89.  The analysis in Kim, thus, is

fully consistent with Morrison.

Indeed, prior to Morrison, the Supreme Court noted in passing that "the wire fraud statute

punishes frauds executed in 'interstate or foreign commerce'" and that "this [18 U.S.C. § 1343] is surely

not a statute in which Congress had only domestic concerns in mind."  Pasquantino v. United States, 544

U.S. 349, 371-72 (2005).  Relying partly on Pasquantino, and noting that the wire fraud statute prohibits

"fraud *simpliciter*" – unlike the securities fraud statutes addressed in Morrison -- the Third Circuit

earlier this year concluded that, under Morrison, the wire fraud statute applies extraterritorially.  United

1  States v. Georgiou, 777 F.3d 125, 137 (3d Cir. 2015); see also United States v. Lyons, 740 F.3d 702, 718

2  (1st Cir. 2014) (relying on Pasquantino to find that the Wire Act, 18 U.S.C. § 1084, applied

3  extraterritorially under Morrison).

4       Thus, even if the Court were to ignore Bowman and, instead, apply Morrison, § 666 and § 1343

5  would still apply extraterritorially.

6       **C.  Prosecution of the Defendants in the United States Does Not Violate Due Process**

7       The defendants next claim their prosecution in the United States violates their right to due

8  process.  This claim is meritless.

9       In United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990), the Ninth Circuit held that "[i]n

10  order to apply extraterritorially a federal criminal statute to a defendant consistent with due process,

11  there must be a sufficient nexus between the defendant and the United States so that such an application

12  would not be arbitrary or fundamentally unfair." (citation omitted).  The Ninth Circuit then concluded

13  that prosecuting the defendant for violating the Maritime Drug Law Enforcement Act based on his

14  extraterritorial conduct did not violate due process because his conduct – attempting to smuggle

15  contraband into United States territory – would have caused criminal acts within the United States.  See

16  id. at 249.

17       Similarly, prosecuting the defendants for their bribery scheme in the United States does not

18  offend due process.  The defendants corrupted ICAO, an international organization in which the United

19  States was a seminal member, to which the United States contributed millions of dollars each year that,

20  in the time period charge, amounted to roughly 25% of ICAO's budget, and that implicated national

21  security because ICAO set standards for international travel documents.  Under these circumstances,

22  there was more than sufficient nexus between the defendants and the United States.

23       "In instances in which charged conduct involved non-U.S. citizens and occurred entirely abroad,

24  'a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to

25  U.S. citizens or interests.'"  United States v. Mostafa, 965 F. Supp.2d 451, 458 (S.D.N.Y. 2013)

26  (quoting United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011), and citing United States v.

27  Yousef, 327 F.3d 56, 112 (2d Cir. 2003).  "Defendant's specific intent to harm Americans is not what

28  the law requires.  Rather, Courts have found a sufficient nexus to exist based upon factors such as the

1   defendant's citizenship or residency, the location of the acts allegedly giving rise to the suit and whether

2   those acts could be expected to or did produce an effect in the United States.  It is also unnecessary that

3   defendant had any expectation that he would be prosecuted in the United States." Mostafa, 965 F.

4   Supp.2d at 459 (citations omitted); compare United States v. Brehm, 691 F.3d 547, 552-53 (4th Cir.

5   2012) (rejecting due process claim of South African national who was convicted in the Eastern District

6   of Virginia of assaulting a British national at Kandahar Airfield in Afghanistan because the "American

7   influence was so pervasive [at the Airfield] that we think it a suitable proxy for due process purposes,

8   such that the imposition of American criminal law there is not arbitrary"); Al Kassar, 660 F.3d at 119

9   (holding that prosecuting foreign arms dealers in the United States did not violate due process; "[f]air

10  warning does not require that the defendants understand that they could be subject to criminal

11  prosecution *in the United States* so long as they would reasonable understand that their conduct was

12  criminal and would subject them to prosecution somewhere") (emphasis in original); Yousef, 327 F.3d

13  at 111 (holding that prosecuting terrorists in the United States who plotted outside the United States to

14  bomb American airplanes in Asia did not violate due process).

15      Because the defendants' crimes compromised the interests of the United States in an important

16  international organization, the prosecution of the defendants in the United States does not violate due

17  process.

18      **D.    The Wire Fraud Related Charges Are Properly Pled**

19      The defendants next claim that the wire fraud counts should be dismissed because they fail to

20  state a claim, are duplicitous for failing to identify specific wire transactions, and fail to allege an

21  "official action."  These claims are meritless.

22      Counts One and Two of the Indictment are more than sufficiently pled.  They not only track the

23  statutory language of the wire fraud and wire fraud conspiracy statutes, see Indictment ¶¶ 26, 28, they

24  also describe the bribery scheme in detail, see id. ¶ 10, explain the property that was the subject of the

25  fraud scheme, see id. ¶ 9, specifically explain that the defendants used wire communications – including

26  e-mail messages, see id. ¶¶ 26, 28 – in furtherance of their scheme, and provided examples of the e-mail

27  messages, see id. ¶¶ 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23.  Counts One and Two comply

28  fully with Fed. R. Crim P. 7(c).  See, e.g., United States v. Garlick, 240 F.3d 789, 792 (9th Cir. 2001)

1  (holding that the elements of wire fraud are: "(1) a scheme to defraud, (2) use of the wires in furtherance

2  of the scheme and (3) a specific intent to deceive or defraud"); <u>United States</u> v. <u>Frega</u>, 179 F.3d 793, 803

3  (9th Cir. 1999) ("In order to convict for mail fraud, the jury had to find a scheme to defraud Californians

4  of their right to the judges' honest services, and a use of the mails in furtherance of that scheme.  The

5  evidence need not exclude every hypothesis but that of a single scheme."); <u>see</u> <u>also</u> <u>United States</u> v.

6  <u>D'Amelio</u>, 682 F.3d 412, 422-23 (2d Cir. 2012) ("the essential elements of the wire fraud crime

7  involved wire transfers, not specific wire transfers").

8          In addition, Count Two is not duplicitous.[2]  Title 18, United States Code, Section 1343

9  criminalizes any "scheme" or "artifice" to defraud that uses a wire, radio, or television communication

10  transmitted in interstate or foreign commerce in its execution.  <u>See</u> 18 U.S.C. § 1343.  Accordingly,

11  while the defendant is correct that each wire transmission *can* constitute a separate count, it does not

12  follow that each wire transmission *must* be charged as a separate count.  Rather, a violation of § 1343

13  can be charged as a scheme, so long as there is proof that a wire communication was used in furtherance

14  of the scheme.  <u>See</u> <u>United States</u> v. <u>Tutino</u>, 883 F.2d 1125, 1141 (2d Cir. 1989) (holding that acts that

15  could be charged separately may be charged in a single count if the acts could be "characterized as part

16  of a single continuing scheme" and that aggregation of acts is permissible "[a]s long as the essence of

17  the allege crime is carrying out a single scheme to defraud"); <u>see</u> <u>also</u> <u>United States</u> v. <u>Buchmeier</u>, 255

18  F.3d 415, 421 (7th Cir. 2001) ("an indictment charging multiple acts in the same count, each of which

19  could be charged as a separate offense, may not be duplicitous where these acts comprise a continuing

20  course of conduct that constitutes a single offense").

21          Indeed, under the similar mail fraud statute, not only did the Second Circuit reject a duplicity

22  challenge to a mail fraud charge that failed to specify particular mailings after the Government specified

23  which mailings on which it would rely at trial, the Second Circuit also noted that aggregating multiple

24  mailings into a single count actually benefited the defendant:

25  //

26

27  _____

28  [2] The defendant's duplicity claim is only applicable to Count Two, the substantive wire fraud count.
Count One, in contrast, charges wire fraud *conspiracy*, and, as a conspiracy, it does not require the
commission of any wire transfer in order to be committed.

1
2
3
4

   With the mailings on which the Government will rely now reduced to a manageable
   number, their placement in a single count achieves the obvious benefit of limiting the
   maximum penalties defendant may face if convicted of mail fraud and also avoids the
   unfairness of portraying the defendant to the jury as the perpetrator of 50 crimes.  We
   anticipate no unfairness to the defendant if the jury, properly instructed, is permitted to
   convict on Count One upon finding all of the elements of mail fraud established,
   including the mailing of at least one item in furtherance of the scheme to defraud.

5   United States v. Margiotta, 646 F.2d 729, 733-34 (2d Cir. 1981).  As the Second Circuit explained

6   further:

7
8
9
10

   [A] single count of an indictment should not be found impermissibly duplicitous
   whenever it contains several allegations that could have been stated as separate offenses
   . . ., but only when the failure to do so risks unfairness to the defendant.  That risk is
   slight in a case like this where the essence of the alleged wrong is the single scheme to
   defraud and the various mailings, though they are technically the acts that violate the
   federal statute, are really the jurisdictional bases for federal prosecution.

11   Id. at 732-33 (citations omitted).

12      Here, Count Two is not duplicitous.  Rather, Count Two merely charges the defendants with a

13   single continuous wire fraud scheme that used multiple wire transmissions – notably, the various e-mail

14   messages set forth, for example, in paragraphs 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23 of the

15   Indictment, which, of course, are incorporated by reference in Count Two via paragraph 27 – to execute

16   the scheme.  The defendants' duplicity claim, thus, should be rejected.

17      In any event, evening assuming that Count Two is in fact duplicitous, dismissal of the count is

18   not the proper remedy.  Rather, as the Ninth Circuit has explained:

19
20
21
22
23
24

   "[t]he rules about . . . duplicity are pleading rules, the violation of which is not fatal to an
   indictment.  Defendant's remedy is to move to require the prosecution to elect . . . the
   charge within the count upon which it will rely.  Additionally, a duplicitous . . .
   indictment is remediable by the court's instruction to the jury particularizing the distinct
   offense in each count of the indictment." United States v. Robinson, 651 F.2d 1188,
   1194 (6th Cir. 1981).  In other words, a defendant indicted pursuant to a duplicitous
   indictment may be property prosecuted and convicted if either (1) the government elects
   between the charges in the offending count, or (2) the court provides an instruction
   requiring all members of the jury to agree as to which of the distinct charges the
   defendant actually committed.

25   United States v. Ramirez-Martinez, 273 F.3d 903, 915 (9th Cir. 2001), overruled on other grounds by

26   United States v. Lopez, 484 F.3d 1186 (9th Cir. 2007) (en banc); see Buchmeier, 255 F.3d at 425-26

27   (holding that unanimity instruction cured duplicitous counts).  Thus, even if Count Two is duplicitous,

28   the defendants' motion to dismiss should still be denied.

1    Moreover, as far the defendants' claim that the wire fraud charges are defective because they fail

2    to allege an official action, this claim is meritless.  As noted above, the wire fraud charges track the

3    relevant statutory language, describe a scheme pursuant to which Siciliano received bribe payments and

4    other consideration from Vassiliev and Sidorenko in exchange for Siciliano using his employment in

5    ICAO to help Vassiliev and Sidorenko, and set forth specific e-mail messages transmitted in furtherance

6    of the scheme, including e-mail messages that detail the actions that Siciliano took to help Vassiliev and

7    Sidorenko.  See Indictment ¶¶ 9-28.  The wire fraud charges, thus, more than comply with the

8    requirements of Fed. R. Crim. P. 7(c) and applicable case law, and clearly allege that Siciliano took

9    action as an ICAO official for the benefit of Vassiliev and Sidorenko as a direct result of bribes paid by

10   them.  The scheme described in the wire fraud counts clearly goes beyond mere access and ingratiation

11   as Siciliano asserts.

12   Finally, the claim that there was no official action alleged is particularly hollow when directed at

13   Count One.  Count One is a conspiracy charge, and it is well-settled law that the crime of conspiracy is

14   fully committed once the unlawful agreement is formed, regardless of whether there is any subsequent

15   act taken in furtherance of the agreement.  See, e.g., Salinas, 522 U.S. at 65 ("It is elementary that a

16   conspiracy may exist and be punished whether or not the substantive crime ensures, for the conspiracy is

17   a distinct evil, dangerous to the public, and so punishable in itself.").

18   The defendants' claims against how the wire fraud counts are pled should be rejected.

19   **E.      The Federal Program Bribery Related Charges Are Properly Pled**

20   The defendants contend that the federal program bribery charges are defective because they:

21   (1) fail to allege that the organization that was influenced was the organization that received federal

22   funding; and (2) fail to allege that Siciliano's actions were connected to ICAO's business.  These claims

23   ignore the plain meaning of Counts Three, Four, and Five, and are meritless.

24   The federal program bribery charges clearly allege a scheme pursuant to which Vassiliev and

25   Sidorenko bribed Siciliano so that Siciliano would use his position in ICAO to do favors for them, such

26   as endorsing EDAPS, getting a visa through ICAO for Vassiliev's girlfriend, and fast tracking the

27   assignment of an ICAO passport code for an EDAPS project.  Thus, the organization that was affected

28   by the bribery scheme was ICAO, not the OCSE or INTERPOL as the defendants assert.  In addition,

1   this conduct clearly fell within the scope of ICAO's business.

2       In any event, the conduct prohibited by § 666(a)(1)(B), and charged in Count Four, includes

3   "agree[ing] to accept something of value from a person," while the conduct prohibited by § 666(a)(2),

4   and charged in Count Five, includes "agree[ing] to give something of value to a person."  Thus, mere

5   agreement is sufficient to violate the bribery provisions of § 666.  No further acts, let alone actual

6   "official conduct" need to be taken into order commit a crime under § 666; the agreement accept or give

7   something of value is sufficient without having to allege, let alone prove, an effect on ICAO's business.

8   As such, the federal program bribery counts are sufficient pleaded.

9       **F.**    **Siciliano Does Not Enjoy Immunity from Prosecution**

10       Siciliano contends that he enjoys immunity from prosecution by virtue of his employment with

11   ICAO, and independently, because he was traveling on a United Nations travel document – the *laissez-*

12   *passer* – at the time of his arrest.  These claims are meritless.

13       First, Siciliano's claim that he was entitled to diplomatic immunity because he was traveling on a

14   United Nations *laissez-passer* is mistaken.  The *laisser-passer* is merely a travel document (which is not

15   recognized by the United States) and, by itself, does not signify that the bearer enjoys any privileges and

16   immunities.  To benefit from any privileges and immunities, the bearer would still have to meet the

17   requirements set forth in some relevant legal instrument, such as the Vienna Convention on Diplomatic

18   Relations.  As explained below, there is no indication that Siciliano was a diplomatic agent of any state

19   or was employed by the United Nations itself.

20       Although diplomats enjoy broad immunity from civil and criminal process under the Vienna

21   Convention on Diplomatic Relations (the "Vienna Convention"), the Vienna Convention does not cover

22   Siciliano.  In order to enjoy diplomatic immunity, one has to be assigned to a diplomatic mission or

23   identify another law or treaty that would confer such privileges and immunities.  As explained in the

24   accompanying declaration of Chenobia C. Calhoun, a Senior Protocol Officer in the Diplomatic Affairs

25   Division of the Office of the Chief of Protocol of the United States Department of State, the Department

26   of State maintains records of individuals who are accredited as diplomatic agents or consular officials

27   and employees of embassies, consulates, and missions to the United Nations and other international

28   organizations.  See Calhoun Dec. ¶ 3.  According to a review of the relevant records, there is no

1   indication that Siciliano was ever notified to the State Department as a diplomatic agent.  See id.

2   According to Ms. Calhoun's declaration, Siciliano does not qualify to be a diplomatic agent because, for

3   example, he did not possess a diplomatic title or hold an A-1 non-immigrant visa, he did not generally

4   reside in the Washington, DC area, and he was not devoted on an essentially full-time basis to official

5   diplomatic duties, as required by a May 1, 1985 circular diplomatic note.  See id. ¶ 5.

6          Similarly, Siciliano cannot claim immunity under Article V, Section 18 of the Convention on

7   Privileges and Immunities of the United Nations (the "U.N. Convention") pertaining to "Officials of the

8   United Nations" because there is no indication that he was employed by the United Nations.  See id. ¶ 7.

9   Siciliano was an employee not of the United Nations, but of ICAO, which is an entirely separate

10  international organization founded pursuant to a different convention, and American financial

11  contributions to which were made pursuant to a different funding statute.  In addition, even if Article V,

12  Section 18 of the U.N. Convention could apply to Siciliano, it would not entitle Siciliano to immunity

13  from this prosecution.  Rather, the U.N. Convention would entitle the *United Nations* to invoke

14  immunity on behalf of an employee "from legal process in respect of words spoken or written and all

15  acts performed by [him] in [his] official capacity," which the United Nations has not done.  See Bahel,

16  662 F.3d at 623 ("Section 20 of the [United Nations] Convention provides that: 'Privileges and

17  immunities,' such as immunity from prosecution, 'are granted to officials in the interests of the United

18  Nations, and not for the personal benefit of the individuals themselves.'").

19         As an employee of ICAO, under the International Organizations Immunities Act ("IOIA"),

20  Siciliano arguably could enjoy immunity from prosecution arising from his official actions.  See 22

21  U.S.C. § 288d(b).  However, even this limited immunity does not apply here.

22         First, § 288e(a) states that "[n]o person shall be entitled to the benefits of this subchapter, unless

23  he (1) shall have been duly notified and accepted by the Secretary of State as a[n] . . . officer, or

24  employee. . . ."  As noted already, there has been no such notification or acceptance by the Secretary of

25  State with respect to Siciliano.  See Calhoun Dec. ¶ 7.

26         Second, any immunity enjoyed under the IOIA is not for Siciliano to assert, but rather, is for

27  ICAO to assert on behalf of Siciliano.  See 22 U.S.C. § 288d(b) ("[O]fficers and employees of such

28  organizations . . . shall be immune from suit and legal process relating to acts performed by them in their

1    official capacity and falling within their functions . . . except insofar as *such immunity may be waived by*

2    *the . . . international organization concerned*") (emphasis added).  ICAO has not indicated any intent to

3    seek immunity for Siciliano.  Indeed, by letter dated March 27, 2015, ICAO Secretary General Benjamin

4    advised that the conduct for which Siciliano has been charged "was not a function of his employment

5    and was not performed in his official capacity."  March 27, 2015 Letter from ICAO Secretary General

6    Benjamin, attached as Exhibit A to the Declaration of W.S. Wilson Leung.  Thus, § 288d(b) does not

7    apply to Siciliano.  In addition, even if § 288d(b) somehow did apply, its provisions are for ICAO, not

8    Siciliano, to invoke, and ICAO has explicitly stated it is not invoking any claim of immunity on

9    Siciliano's behalf.  See March 27, 2015 Letter from ICAO Secretary General Benjamin ("ICAO is not

10   asserting that Mr. Siciliano is immune from criminal prosecution with respect to his alleged actions").

11          Siciliano's additional assertions regarding immunity are all mistaken.  For instance, he suggests

12   that the "U.S. State Department Policy Guidance" he cites somehow confirms his entitlement to

13   diplomatic immunity in the United States.  That guidance, which appears to be an excerpt from a booklet

14   providing guidance on diplomatic and consular immunities for law enforcement and judicial authorities,

15   is part of a section describing the privileges and immunities accorded the "Personnel of National

16   Missions to International Organizations."  As an employee of ICAO, however, Siciliano was not part of

17   any national mission to the United Nations or any other international organization.

18          Further, an examination of the primary international legal obligation underlying the general

19   guidance makes clear that Siciliano does not qualify.  The U.N. Convention, Article IV, Section 11,

20   states that "[r]epresentatives of [UN] Members to the principal and subsidiary organs of the United

21   Nations and to conferences convened by the United Nations shall, while exercising their functions and

22   during their journey to and from the place of meeting," enjoy privileges and immunities, including

23   immunity from arrest.  By its terms, this article is limited to member state representatives to the United

24   Nations or member state representatives traveling to a United Nations-convened conference.  Siciliano

25   falls in neither category because he was merely an employee of ICAO.

26          Finally, as a factual matter, Siciliano's suggestion that he was traveling on his *laisser-passer*

27   when he was arrested is demonstrably incorrect.  According to the Customs Declaration that was found

28   on Siciliano when he entered the United States, he was in transit from Australia and was traveling on his

1  Canadian passport.  <u>See</u> Exhibit B to the Declaration of W.S. Wilson Leung.  Accordingly, any

2  suggestion that Siciliano was somehow traveling on his *laissez-passer* is simply wrong.

3          In light of the foregoing, Siciliano's claim of immunity from prosecution is meritless.

4  **IV.      Conclusion**

5          For all of the foregoing reasons, the defendants' motions to dismiss should be denied.

6  Dated: April 1, 2015

7                                                          Respectfully submitted

8                                                          MELINDA HAAG
                                                           United States Attorney

9

10                                               By: _____/s/_____
                                                           DAMALI A. TAYLOR
11                                                         W.S. WILSON LEUNG
                                                           Assistant United States Attorneys

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28